This case is here for the second time. The first time, this court vacated litigation-ending sanctions imposed under Rule 37B because the district court found conduct that was reckless, is insufficient under this circuit's heightened standard to impose litigation-ending sanctions. This time, this court should reverse the re-imposition of the same sanctions for three reasons. First, this is a textbook case of abusive discretion because the district court relied upon clearly erroneous factual findings to support his sanctioning theory, and his sanctioning theory is irreconcilable with the undisputed record, the earlier factual findings in the case, and this court's opinion. Remember the foundational facts for a moment, as found or as confirmed by this court in its first opinion. In discovery, Ticket sent a highly confidential spreadsheet to SEATS without designating or marking the native spreadsheet as highly confidential and without marking the file name as highly confidential. Over a year later, after the trial was over, SEATS CEO Milford Skane requested from two litigation consultants a non-confidential affiliate list, which he was intending to use in discussions with Ticket's CEO. Both each of those litigation consultants went through their files and sent, mistakenly, the highly confidential Ticket list spreadsheet, and Mr. Skane then forwarded the list on to Ticket's CEO, again, to engage in settlement discussions. The district court, taking those straightforward facts, has constructed with Ticket an elaborate conspiracy theory that concludes that Milford Skane acted intentionally and in bad faith. This is despite the fact that he looked at all the evidence before and found reckless conduct, and Chief Judge Elrod, you observed at the first oral argument, that if I steal your laptop, I don't go walking into your office waving the laptop. It doesn't make any sense. Equally so, Skane, had he knew he had the confidential spreadsheet, he doesn't send it back to Ticket knowing that he's going to get caught and knowing that he's going to face the motion. And here we are, five, six years later, litigating the sanctions motion. And there's a smoking gun here that I really, we had a lot of arguments in our brief because the district court made a lot of errors. But there's a smoking gun here that I really want to focus this court on. And it's a clearly erroneous factual finding that really forms the entire basis for the district court's conclusion, finding that Skane acted in bad faith. And it's found at footnote 14, and in the record that's at 14492, it's on page 29. And in the footnote, he says that the notion that there would be a non-confidential list of his affiliates is illogical, and that there's no indication in the process, no evidence in the record that Seats would have had either a partial or a complete list of Ticket's affiliates. That is demonstrably false. And frankly, it's a little bit outrageous, and I'll tell you why. Seats's business, as Ticket has conceded in this appeal, again, an oral argument in its brief, is a non-practicing intellectual property firm. All they do is license and litigate. So of course they had a list. Does that mean they're a patent troll? They have certain patents, and they've used them, yes, to go and license. Well, you had also said something in your brief about industry leaders, so I didn't understand what that meant. Yeah, they're a leader. The technology they have is to select Seats, S-E-A-T, and they have the patents on the technology in order so people can see the Seats that they're going to sit on. But the key point here is this. That footnote forms the predicate basis for the district court's finding, and it's wrong. And we know it's wrong because Seats's business is to find infringers, and Sonia McAuliffe, the litigation consultant, the reason, let me say this, Skane asked Sonia McAuliffe for a non-confidential list because that was her job. Her job was, and this is in the district court's sanctions opinions, both of them, at 14480, she testifies, and as I said, it's in the order as found by the judge, that her job was to identify infringers, and that included tickets affiliates. That was her job, was to go in and look at... When you say affiliates, do you mean customers? Yeah, they're websites, actually. So Ticket Network sells tickets, and then they also have affiliates who have websites, and people who are trying to get tickets use those websites, but Ticket is responsible. Like the, let's say the Houston Symphony would be an affiliate of Ticket? They could be. Normally it's third party, normally it's other third parties that would be based, that would use getseats.com or something like that, and it would resolve over to Ticket Network. So Skane asked Sonia McAuliffe, the litigation consultant, for a non-confidential list because that was her job, and she actually testified, and it's found in the record as well, at 7458, I believe the number is. She testified, let me double, I apologize, I want to make sure, 7513. It's in your brief. It's in my brief, 7513 at the show cause hearing. She said, we had another list, we had a list. Let me ask you a question, and I understand that argument that they had a list because they were trying to find infringers, and so theoretically Skane was asking for that kind of list. Two questions, number one, coming out of this first opinion, what did the parties think that was going to be done on remand? And this obviously gets into the law of the case and the mandate rule, and Seitz's position all along has been that after the district judge looked at over a thousand pages, had an issue, spent a year looking, and came up with the conclusion that it was reckless, that a finding of recklessness is fundamentally inconsistent with a finding of bad faith. Well, I agree, well, I'm inclined to agree with that, but I mean, it looks to me like the affirm and remand was for the judge to recalculate in closer alliance with the purposes of Rule 37. You mean in terms of the attorney's fees? Well, attorney's fees or the bar, I mean, they just vacated the bar. Yeah. So, it's not at all clear to me that the bar was to be maintained in any way. Yeah, it wasn't, the mandate only specifically, at least in the text of the mandate, had instructions to recalculate the attorney's fees. It didn't have a specific, like other mandates in similar cases do, that said that, oh, the district should go over and re-look at bad faith. The chief judge was on the panel, so I'm sure not going to try to speak for her, but I mean, I've read the opinion umpty-dumpty times, and the panel knows how. Generally speaking, the panel only rules on what it has to rule on, and it could have said, you know, end of the line. It doesn't. Principally, I read, the district court erred by not giving notice before, you know, putting a hammer down, sanction, no notice, King's X, they're absolutely out, sends it back for remand, as Judge Jones asked. It's a little bit incredulous to me for counsel not to understand that on remand, a whole bunch of stuff is going to happen. Normally, and I think I read here, the judge asked the parties, brief, next steps. Is that accurate? Yeah, they did. So, lawyers, you tell me, you know, what's supposed to happen. He's reading it, and so on and so forth and all that. I mean, I get your characterizations and all that, but the point being, it's fairly routinely sent back down. Yes. Judge asked lawyers, brief what you see, the next steps to be, yah, yah, yah, and go back and forth and all that, so crank up a hearing. So, then the briefings go from there, but you make the argument as if the panel is going    to make it, and then the panel, as a plenary matter, said, King's X. You have determined, reckless only, go and do no more, and I don't get that for the record. I get your argument about why it's not there, but suggested with the panel say it just cuts everything off, I don't really get that. I understand, and that's why we're focusing in our brief about the actual sanction finding that the judge found on remand. We believed, and there's a footnote in the panel opinion that says that inadvertently found reckless, so he could never get to bad faith, no matter what. Yah, you know, as I said, I think there may be a theoretical way that the judge could find bad faith after the remand, and that's why we're focusing today. What the judge can't do, though, is, like in a car accident, if the judge finds that the one driver didn't look either way and just recklessly went into the intersection, and on remand, the judge can't say, oh, the driver looked both ways and intentionally went. So I want to focus the court not on the ultimate finding, but on the factual findings that form the predicate basis for bad faith. How about prejudice? If I can finish, respectfully, if I can, you've asked for the best case, and Pressy versus Patterson at 1021 is directly on point on this first point, because this court reversed a sanction, a litigation-ending sanction. It overturned a clearly erroneous finding. A finding is clearly erroneous, and found that that was the predicate basis for bad faith, and then, therefore, it reversed the entire sanction, and I think that's what we have here. And as I said, the smoking gun here is that the district court also found that Sonia McAuliffe, when she was asked by Skane, before she sent the spreadsheet, the highly confidential spreadsheet, and this, again, this is in the opinion at 14481, she sent him public links of TicketWorks affiliates. So it's absolutely uncontroverted that there are non-public, there are, excuse me, public non-confidential lists of affiliates. So once you realize that, then footnote 14, which is the crux of the district court sanctioning opinion, the entire house of cards falls away. There's no way the judge can get to this idea that Skane wasn't asking for a non-confidential list, he was asking for a sinister non-confidential version of the list, which is what the district court is saying. There's no way you get there if that factual finding in 14 is wrong. And I'm sorry, for prejudice, for prejudice, there's multiple problems with prejudice. Here we are five years later, and there's still no concrete palpable harm to Ticket. They can't point to anything. And here, the district court, again, seems to have kind of made a record for Ticket, saying that they're competitors. And they're not competitors. As this court has realized, they both, Seat Ticket sells tickets, and Seat is a licensing and a litigation firm. So again, that factual finding that forms the basis for harm, that somehow, and that's in footnote 20, those two smoking gun footnotes, collapses the entire sanctioning theory that the district court is on. And I have one other question to set this up. What is your position about the litigation bar? Is it expired? It will, if you calculate it out, I mean, obviously, if this court affirms, then it will have expired by the end. It will have expired. But the problem is, in the meantime, the statute of limitations has been running. So what the judge has basically done is dismiss all of Seat's claims going back. And so they've lost all the claims that they had, the pre-existing claims that they had against Ticket that the judge said you couldn't put before the jury because they weren't ready. They were getting ready. They were going to file them. And because of this licensing bar and litigation bar, which has work in tandem to do that, they're not doing anything. They're dead in the water. They can't license. They can't sue. They can't do anything out of fear that they might sue someone who's on the list that they can't review. And there's one other point that I, you do have some valid patents. Absolutely. The four were declared invalid and you have a bunch of others. Yeah. And there's actually, there were just four claims within the patents. And, you know, just because claims get declared invalid doesn't have anything to do with Seat's entire portfolio of patents. And that's the breadth of this litigation injunction. It wasn't tailored just to the claims in this case. It wasn't focusing on anything. It's no contact. So a car accident, if Ticket Network hit Seat's in a car accident, Seat's couldn't go out. I mean. I get the point. Yes. Thank you very much. All right. Thank you. All right. Mr. Affeld. Thank you, Your Honor. I want to, David Affeld on behalf of Milford Skane. Thank you, Your Honors, this morning. I want to touch on a few points only. The first is to address the question posed to Seat's. What was to be done on remand? Milford Skane was not afforded due process. At a minimum, he should have been afforded due process on remand. That didn't happen. What the other parties were able to do during the first round that led to the first appeal, there were many rounds of briefing, hundreds of pages of  Discovery was permitted. Depositions were permitted. Milford Skane did not get a chance to participate in any of that. And on remand, nothing was done to fix that. What happened was the cement had dried. Depositions were necessary because Milford Skane, if once he did know that he was in the crosshairs, would have taken deposition testimony of Ticket Network to confirm that Ticket Network had suffered no palpable harm. He would have developed a record to show. Did he ask to do any of that? I'm sorry?  I'm sorry. I could not hear you. Did he ask? Yes. Did he ask to do any of that? Yes. The district court invited the parties to weigh in on what they thought should happen after remand. We asked for discovery. The court said no. The court's opinion explains the March 22nd, 2024 opinion, explains why the court felt that no discovery needed to be afforded to Mr. Skane. But respectfully, we think that's entirely wrong. What was the nature of the discovery request? For one thing, to confirm with Ticket Network that it had not suffered any substantial or palpable harm, zero customer loss, zero contact with any of their customers or affiliates. In addition, we would have preserved testimony. A key witness died. Brian Billett was one of the individuals, a co-defendant in the proceedings. He passed away. So what he could have contributed about the inadvertence of the production and the fact that work had been done independently from public sources to develop lists of customers, the witness who could have testified to those things is no longer available. Because due process can't be afforded at this point, it can't be fixed, the initial violation can no longer be cured. When the court remanded, the district court was given an opportunity . . . Well, Mr. Skane, so the bottom line is, because you have limited time, the bottom line is the court heard testimony on remand from Mr. Skane. He heard from Miss . . . the lady. And then he decided that where Skane might have been reckless before, now he was just a palpable liar. The court, in our view . . . Right. . . . had outcome-oriented reasoning with respect to him. Other things would have shown what really happened and the lack of palpable harm is fatal to the proceeding. But what I'm suggesting is that had there been some discovery, the court might not have as easily been able to make this new conclusion. That's correct, Your Honor. And if I could use my one minute of rebuttal now rather than later . . .  . . . I just want to touch on one other thing. The magnitude of sanctions. If the court decides that sanctions should be imposed against Milford Skane, all of the sanctions decisions from the circuit take into account somebody's ability to pay. Mr. Skane doesn't have an ability to pay. It is undisputed that the district court did not take into account his ability to pay. The March 22, 2024 opinion says instead why it doesn't have to take that factor into account. But all of the decisions from the circuit do take into account whether sanctions are ruinous to somebody. In the Coates case, 890 F. 2nd at 728 and the pinpoint site 734, the Fifth Circuit held that the court has to take into account a person's ability to pay. It is an abuse of discretion not to. The facts in that particular case, sanctions were in the amount of $20,000. The person's annual income were $22,000 to $28,000. So less than one year of annual income was excessive and warranted reversal. In this case, the sanctions are $500,000, and the only evidence in the record is that Mr. Skane makes approximately $20,000 a year from Social Security benefits. So the sanctions are more than 25 times his annual income. That's the state of the record that can't stand. It has to be reversed. Okay. All right. Before you leave, though, I want to make sure I understand what the state of the record is, based on what you're saying. On the remand, the district court had to make this finding, as I read, and I'm going to go back and read it again, that with respect to bad faith, Mr. Skane signed a protective order. The district court found he attended discovery hearings where the parties fought over the production of the affiliate list. He knew that the affiliate list was confidential when it was produced. He made false statements to the court. He destroyed evidence to obfuscate his discovered misconduct, ROA 14490, et cetera. So my only question is, if I misread it, but if the argument was made that, you know, there was no discovery, yada, yada, that, you know, on remand, maybe this just came out. I hadn't read every page in this record. I'm not quite sure if I have to, but obviously it's serious. I just want to make sure I understand the thrust of your argument, vis-à-vis it wasn't allowed to discover due process violation versus the findings the district court made in terms of what Mr. Skane said when he testified, credibility of the sentence, so I can properly appreciate the argument you make. Do you follow me? Yes. Yes, Your Honor. The discovery would have buttressed Mr. Skane's position that he didn't know about the confidentiality of this particular document. A person who has passed away now would have firmly corroborated that the instructions were give me a non-confidential document, that non-confidential documents existed because that was part of what the consultants were hired to do, is to develop from public sources like the Wayback Machine going to websites, to pull from completely public sources lists of . . . So in essence, you're saying the discovery he requested would have rebutted, if you will, the findings that the district court made? That's exactly right.  As I said, I just want to understand the quality of your argument that there being discovery and so forth. I got you. Yes. Okay. Unless the court has any further questions. No, sir. Thank you. All right. Mr. Thornburg. Thank you, Your Honor. Thank you, Your Honor. May it please the court. I'm John Thornburg for Ticket Network. Tell us how Ticket has ever been harmed by disclosing the confidential customer or affiliate list to Ticket Network. Yes, Your Honor. As the record was developed below, Ticket Network considered its affiliate list its top secret. We understand the whole breach of confidentiality order and all that. We understand that Mr. Skane got a copy of it, that there was disputes about whether it was inadvertent. The most the court found the first time around was that it was reckless. I know we use the term at least. We can talk about later whether the first panel clearly told the judge he could go into the whole thing again. My point is prejudice. What prejudice? The loss of the secret . . . It wasn't lost. It was given to the CEO of Ticket. Of a competitor that can use it against us. He's not a competitor. They're not a . . . With respect, Your Honor, Judge Gilstrap found that it was a competitor. Yes, but that's not . . . How can that possibly be? Because . . . They don't sell seats, do they? Because they're both intellectual property companies. Our company makes software. They have patents. They're both trying to get money from the same websites. We are in the business of licensing . . . No, what . . . Yes. We're trying to license these websites to use our software to sell seats to events. They're trying to get those same people to pay them money for . . . I thought at some point Ticket had agreed to bear the royalty payments for its affiliates. In the litigation, that's how it developed. There was no harm in that pending litigation. In the pending litigation, that one was over, though. I know it was over. The question is what's going to happen next. The threat from Mr. Skeen, very clearly, was we're going to mess with your customers. No. We're going to disrupt your relationships. Maybe the district court bought that, but I just don't understand it, because the threat was we want royalties on the patents, the valid patents that we own. The only way we can calculate the royalties is by knowing to whom, with whom you are licensing whatever this program for tickets is. And giving the CEO and other licensing people at seats the list of our customers with their revenues. Suppose they got it from public information. This is why it's very important to defer to the district court for fact findings, because the facts, as reported by the other side, are simply wrong. If you look at ROA 7083-84, Ms. McAuliffe, under cross-examination, admitted that there was no public list like what she gave to Mr. Skeen. The question was, have you ever compiled a list of websites, of ticket networks' websites? I know that, but all that means is that she inadvertently, and he let her off the hook, so she was not liable. She inadvertently disclosed the confidential list. Fine. But he wanted her to do it. He said non-confidential. But if you look at his request, again, the record is very important, that if you look at ROA 4080 and 4078, that's where we see Mr. Skeen requesting this from Ms. McAuliffe and Mr. Billett, and what he said is he wanted something that was not marked confidential. And actually, in 4078, she admitted, here's the public information from the websites, and she says that, and then also attached is, quote, what they sent. So she told him that she was sending him what a ticket network produced, and she may not have remembered that it was confidential, but he sure should have, because he attended the two discovery hearings where this was hotly contested. And in the first hearing, the judge found that he was reckless. At least. Well, at least is not. We say we use adverbs all the time, but the word was reckless. It was not lying in bad faith. Well, because he had the wrong standard, and this is what the court was asking. Well, and this goes to, of course the court had, but he still found a fact. He could have found lying and in bad faith in order to impose the same sanction, couldn't he? And then it wouldn't have been reversed, but he chose to use the word reckless. Then it comes back. Then Skane doesn't do any discovery. One witness is dead, and the judge says, oh, I'm still mad at these guys. Well, now I find he's lying. So either it seems to me there's a due process problem, or he's making a finding that he didn't make before that it's not at all clear to me he was. So two things, Your Honor. One, at least reckless is entirely consistent with bad faith. And this was the main point of the argument of Uruguay. I don't know any dictionary that says at least reckless equals bad faith. No, at least allows the possibility. It's not inconsistent. It's not inconsistent. And the main point of the argument of Uruguay, just re-listen to it, and the chief judge asked repeatedly, what do we do if the judge used the wrong definition of bad faith? Because our definition of bad faith that we had submitted and they didn't contest was that bad faith included reckless disregard of the court order. And so chief judge asked repeatedly, if we say this is the wrong definition, what do we do? Do we reverse the way they argued, or do we remand the way we argued? And frankly, if the point had been that it was impossible for us to win, you would have reversed and not remanded. Well, what they did, it's not a, I mean, reading this, I'm surprised, you know, no disrespect to my prior panel, but it says we vacate those parts of the sanction order that impose joint and several monetary liability against the individuals. That imposed the licensing bar, and that denied the tolling request. And there's a sentence that we quote repeatedly in our brief that says that if the court chooses to re-impose the licensing bar, dot, dot, dot. And so it was clearly contemplated that the court could re-impose the licensing bar. That's expressly from the town. What about the litigation bar? It would seem that this is death penalty sanctions, and inappropriate for that reason. And so in the opinion, the court uses the term licensing bar to refer to the litigation bar. The injunction refers to both. And yes, at this point, we lost that argument a year ago. We said it's not death penalty. This court ruled that it is death penalty, and that's why Judge Gilstrap had to make additional findings, including the finding of bad faith. But that's the whole point. Still death penalty and still inappropriate. Why is it not still death penalty, still inappropriate? This was an alleged initial violation, assuming argument it was. Why would death penalty sanctions be appropriate? It just seems completely inappropriate. I think this is something to step back. We put this in our brief a little bit. The importance of protective orders to intellectual property litigation and patent litigation, not just in the eastern district of Texas, but in the whole country. Protective orders are the grease that keeps the whole engine running. In order to do these IP cases, we have to have the deepest secrets of both sides. And the only way to get parties to produce those is to assure them that they're not going to be shared with their competitor, they're not going to be shared with the business people on the other side. Your client didn't even complain about this for a whole year, did they? Your client didn't even complain about this for some length of time. It was a week. This was not an, oh my gosh, we have to get this back immediately. This is the poor thing. Yes, that's wrong, Your Honor. We filed the show cause motion within days. No, no, what the chief judge is pointing out very perspicaciously is that your client's hyper-super-duper confidential list was in the possession of the consultants for the other side for an entire year after the litigation concluded. That was permitted under the protective order because... Well, why? If it's so super-duper confidential, why didn't you insist on getting it back after you resolved the first litigation? The terms of the protective order allow the experts to keep the information until the case has a final judgment and after the appeal, frankly. This is normal. But it did have a final judgment. It didn't. We were still litigating, and that's the problem, is that the case had not yet gone up on appeal, and so the protective order, it's part of the record, is actually still in effect, and so it's for... Is it going to be in effect forever? No, when there's final, final judgment after this court issues its final... Have you ever heard of a death... Have you ever... And I certainly at least take your point about the importance of protective orders, but what you're saying is not just... wasn't just a death penalty for the particular litigation, which the court could have, you know, he could have vacated his judgment and, you know, put the parties back at square one on that litigation. He said going forward you can never sue them again. For a period of months. I know. It's been five years, hasn't it? Well, that's been extended by the process, but the... That's a pretty good free pass if your client is actually invading the patents. Well, the injunction was not in place for many of those months, so there's a defined number of months. Come on. It was in terrorum. It was in terrorum. In other words, pending appeal, they had a death fear that it would be reinstated. They may have had a fear, but it's not nearly as broad as they say. The only lawsuit that they've identified... Have you written anything to them and said it's okay for you to, you know, question our royalties to affiliates? We're not... The only specific case they want to file is the exact same case against different affiliates and different time periods. Well, if they didn't... If royalties are owing, royalties are owing, right? But not if the CEO finds out about which affiliates make the most money through improper means. They shouldn't be allowed to target the best... Did you ask him whether he had any recollection about any of that? He got fired immediately, didn't he? It wasn't immediate, but it was within a year. Yes. But he has absolutely no credibility. Let me remind Your Honor of why Judge Gilstrap found that he was a liar. He did not find that he was a liar the first time around. He did say that he drew adverse inferences the first time around from his destruction of evidence and false statements to the court. He did. But he had no reason to find anything more than at least reckless because that was the legal standard that the parties had agreed to. And so there was nothing... There was no reason for the... He didn't agree to recklessness. The court found that on our first opinion. Excuse me, Your Honor? You argued that they waived the standard of liability on the first opinion, and they lost. And we lost that, yes. But nonetheless, the court was not aware that they had argued it. And so this court, I think, essentially forgave the forfeiture because they had made more general cites and the court didn't want to have the main issue in the case decided that way. But nonetheless, Judge Gilstrap was not aware that they were arguing this. And he was aware the second time. And he addresses this specifically in his opinion and explains why his opinions are not inconsistent and why would this court have remanded rather than reversed if it wasn't going to give him that chance? Well, it could have had less death penalty sanctions. That's why. Well, but the court expressly in the paragraph that I quoted entertained the possibility that he might reimpose the litigation bar. And then it said, and if that happens, they need to discuss tolling, right? It said that if he does... And that's the context in which that sentence... That's correct. Before that, they had said this is the harshest possible penalty possibly even exceeding what penalties are authorized under Rule 37. Another judge might easily have interpreted it as saying, hmm, maybe I better reconsider or narrow, narrow. And instead, Judge Gilstrap doubled down and extended the litigation bar. He restored it to its previous length, taking into account the period that it was vacated. It has now expired. It did expire in December. What's your response to counsel Opposite's argument that he requested he or someone on the case that had requested discovery for the reason to elicit evidence that would rebut or negate findings that the Judicial Court may have made initially or otherwise one of the witnesses, you know, has died, et cetera. And so he makes an argument, you know, no new process, et cetera. So what's... Did you object to the request for discovery that he made with respect to that? And if so, what was the basis of your objection? Yes, Your Honor. We did object to the discovery as unnecessary. The court had allowed extensive discovery, including by seats when Mr. Skane was still running it. And I'm not aware of any authority, and they didn't cite any, that a third party even has the ability to take discovery. Well, if he's up against the finding of sanctions, the district court doesn't think the world of him, you know, based on conduct, et cetera, et cetera. But putting aside the other thing, but he asked the parties to brief what next to happen. Everybody does that. Tee it up, remand, yada, yada. Counsel says he sought discovery for the purpose of, you know, rebutting, calling witnesses, demonstrating that, assuming arguendo that there can be a redo on bad faith or whatever, but I was precluded from putting it on. And that's, I mean, that's what I get from the argument. And so I wanted to know what was your objection. And the only thing I heard you just say, in essence, was that it was either repetitive or surplusage. But how could it be that? How could it be repetitive or surplusage if it's asking it for the purpose of rebutting a finding that the court has made? I'm not understanding your objection other than you don't want me to do it. Well, I mean, Mr. Skane and Seitz control the evidence of their intent. They don't need discovery to find out their own intent. And the only discovery that I heard counsel mention here today was they would want to ask us about our harm. And that's – the harm is obviously very relevant to the injunction. Who was the witness that died and what would his testimony, what would his knowledge have been about? And this court was aware that Mr. Billett had died a year ago when it remanded. And so I think Mr. Skane's position is that due process was impossible because he had died and because there had been all this previous briefing. And in that case, again, the court should have reversed rather than remanded if due process was impossible. And instead it remanded because it believed that due process could still be done. Due process requires notice and the opportunity to be heard. That's what the case law says. It doesn't say anything about discovery, and there's no discovery that he needed. But he's jointly and separately liable for a half million dollars. Yes. That's a lot of money. It is. But there's no discovery that would have negated that because he – That's what you say. And the district court – Doesn't the dependent have some – I don't – a real interesting – you may be overplaying your hand, but – Well, I mean, this court has many opinions saying that the district court has a very wide range of discretion for managing discovery. And here, Mr. Billett was deceased. He was deceased at the time of the last appeal. There was no way to depose him. It is well known that sanctions are called satellite litigation, and I emphasize the word litigation. And you're imposing sanctions on this individual unless you're willing to stand up here and say we're relieving him of that responsibility because he can't pay and it's a lot of money and so on. So to that point, I mean, we are mostly concerned with seats and with the injunction. Seats has paid most of the sanctions so far. You know, we have no – So from your perspective, this whole appeal is just a matter of another 50,000 or so. Is that right? Well, the only reason that we haven't just dropped Mr. Skane is what we told the district court. You know, as between – we're not really expecting him to pay. We want the money from seats. And this court has a firm joint in several, so seats is fully responsible. But we don't think that Mr. Skane should get off free because of his personal bad conduct. I assure you five years of litigation to a guy who's fired by his company and is allegedly living on Social Security is, you know, the process is the punishment, isn't it? I mean, that's one of the most heartless statements I've ever heard in this court. I'm not sure it's adequate because, I mean, as recently as last March when we had the remand evidentiary hearing, he got up on the stand and lied and lied and lied to Judge Gilstrap's face. This is not a good person and he should not get off scot-free. But I don't think – we're expecting to collect half a million dollars from him. We're expecting to collect from his company. But it would be a travesty of justice if he gets off. Wait a minute. I thought you said they already paid the sanctions. They paid 400 out of 500. Counsel, may I be heard for a second and ask a question? Yes, please. I'm confused as to your view that remanding for further proceedings in this matter on the opinion refers to remanding to allow the individuals to be looked at again. That part was vacated, and we remanded for the district court to recalculate the fees. That was the part that was remanded. With respect, Your Honor, I believe you remanded on – So in the fact that it says remand for further proceedings doesn't enlarge the instruction that said we remand for calculation of fees, where we vacated the other portion and did not remand or say it could have further proceedings. We vacated that portion, and we remanded only the part about the amount of the fees. So can you help me why you understand the opinion differently? Yes, Your Honor. We took the word vacate as the permission instead of reverse. That was the main question that we had a year ago was, are you going to reverse or vacate and remand? And the court expressly said that in the sentence that Judge Jones quoted that the court might have to revisit tolling if it reimposes the litigation bar. So we understood, and frankly, seats understood that they said it, and we quote where they said it in our brief, that the remand was for the purpose of due process for the individuals, for recalculation of the fees, and also for reexamination of bad faith. If the court had found there was absolutely no bad faith, you would have reversed. We were vacating that portion. Never mind. I don't want to argue with you about it. But we vacated that, and we remanded something else. Your Honor, with respect, I think that's the opposite of remand, and it's the opposite of reverse. Vacate doesn't mean that you're remanding. It just means you're getting rid of it. So I guess there's no point in us arguing about that. So thank you very much. Thank you. All right. Thank you. All right. Mr. Lasky, rebuttal. Just a couple short points. Oh, sorry. Again, I have the mandate in front of me, and it makes clear that the earlier portions of the court's opinion are vacated. We can read. Yeah. And, I mean, I think it's important, stepping back, looking at the sanction, that it ends claims, putting aside the affiliates, it ends seats' claims against ticket, against the claims that they wanted. It essentially gives them immunity for their preexisting known licensing violations that the jury had already found in favor of seats on. And, in essence, this is almost like jury nullification, that the judge didn't want any more claims against ticket, so he imposes this sweeping injunction that's going to make everything go away. And, you know, the judge uses in his opinion this idea that there was a non-confidential version, and he puts version within the quotes of non-confidential. But the only site that he puts for that is incorrect. It's 7458 is what he relies upon. And if you go back and you look at that testimony, it doesn't say non-confidential version. Skane was asking for a non-confidential list. And that's what the first panel, seats 1, what the court said. It uses the words, Skane asked for a non-confidential list. And I think we've discussed why he asked for it and what he was trying to do. He wasn't trying to do anything else. We have made the argument consistently that any remand was limited. I mean, the court had to remand because of the attorney's fees. And that's what we wound up doing. And the judge kind of reopened everything, as we discuss in our briefs. And the best case, again, is Pressey for the clearly erroneous factual findings. It's also the case that this court used to end the first appeal by saying that negligent conduct or reckless conduct can't form the basis for a discovery, a litigation ending sanction. It also stands for the proposition that in the absence of harm, you can't impose a litigation ending sanction. So it kind of hits all three. One little housekeeping matter, we have the motion on tolling that was there. We clearly believe and will argue whenever we get the chance that the claims that seats had and weren't able to bring because of the wrong sanctions that were imposed against should be that the statute of limitations should toll as far back as February 2019 when Ticket filed their show cause motion. Because, again, we think the specter of the judges would have been on seats had it done anything. I mean, had seats gone ahead and filed a lawsuit the day after they filed their sanction motion when Ticket was explicitly seeking this injunction, I think it would have been viewed somewhat as contemptuous. So those are the three main. The only thing that is argued, and if this court agrees with us, we think reversal, again, is the proper technique on the sanctions front. But it can reverse the upward increase to Ticket's fees, which the district court did. Inexplicably, he set the lodestar and then decided at step two to increase Ticket's fees, which we thought was rather, again, a bit astounding. Seats had made some arguments on the downward adjustment, which the court more or less ignored. Okay. So if this court wants – yeah, my light is on. I'm sorry. Thank you. All right. Thank you. Okay.